659 A.2d 575

**Margaret CARDAMONE**

v.

**Bernadette ELSHOFF, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 9, 1995.

Filed May 24, 1995.

---

266

Petra F. Hoeschele, Philadelphia, for appellant.

Robert Katzenstein, Philadelphia, for appellee.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

CIRILLO, Judge:

Bernadette Elshoff (Mother) appeals from an order entered in the Court of Common Pleas of Philadelphia County, awarding primary physical custody of Jennifer Elshoff (Daughter) to Margaret Cardamone (Maternal Aunt), and awarding partial physical custody of Daughter to Mother. We affirm.

Daughter was born on March 27, 1980.[1] In 1985, Mother married Theodore Rafalko (Stepfather). As a result of that marriage, Mother gave birth to her second child, Gregory (Brother). Mother and Stepfather separated numerous times due to marital problems and substance abuse problems. Because of these separations, Mother and the children were forced to periodically move in with various family members.

Some time in March of 1992, Daughter contacted Maternal Aunt and asked if she could reside with Maternal Aunt, Maternal Aunt's husband (Uncle), and Theresa Elshoff (Maternal Grandmother), all of whom reside in the same household in Philadelphia. The following month, in April of 1992, Daughter moved into Maternal Aunt and Uncle's home. Presently, Daughter is fifteen years old and has been residing in Maternal Aunt's residence for approximately three years. Mother, Stepfather, and Brother currently reside in Scranton, Pennsylvania.

In June of 1992, while Daughter was in the care of Maternal Aunt, Maternal Aunt filed a petition to confirm custody of Daughter. In August of 1992, Mother filed an emergency petition, seeking to regain physical custody of Daughter from Maternal Aunt. Shortly thereafter, the Honorable Nicholas Kozay, Jr., consolidated the petitions and entered a temporary order, pending a full custody hearing, granting physical custody of Daughter to Maternal Grandmother.

The matter was continued on several occasions. On September 17, 1993, a full hearing was held before the Honorable Frank M. Jackson on the cross-petitions for custody. The trial court was presented with the testimony of Mother, Maternal Aunt, Uncle, Maternal Grandmother, and Stepfather. In addition, in the presence of only the attorneys, the trial court examined Daughter *in camera.* At the conclusion of the testimony, Judge Jackson entered a temporary order, maintaining the status quo and giving Mother partial custody on alternating weekends. Pursuant to the order, Mother was

1. Daughter's biological father is not a party to this custody dispute. His whereabouts are unknown.

required to make Daughter's travel arrangements to and from Scranton.

On October 14, 1993, Judge Jackson entered an order, holding the cross-petitions for custody in abeyance until Daughter completed her last year in grammar school. As such, a hearing was scheduled for June 17, 1994. In the interim, temporary physical custody of Daughter remained with Maternal Aunt. Mother filed a notice of appeal from Judge Jackson's temporary order. This court dismissed Mother's appeal via a *per curiam* order because Mother failed to file her brief in a timely fashion. Pa.R.A.P. 2188.

On August 1, 1994, the trial court again heard extensive testimony from all of the participants and again interviewed Daughter *in camera*, then fourteen years old. On August 31, 1994, the Honorable Frank M. Jackson entered an order, awarding primary physical custody to Maternal Aunt, and granting partial physical custody to Mother. Specifically, Mother was awarded partial physical custody of Daughter for one-half of the winter and spring vacations, as well as six weeks during the summer school vacation. This timely appeal followed. On appeal, Mother presents the following questions for this court's consideration:

(1) Whether the trial court erred in its failure to dismiss a third party petition for custody where the third party did not have *in loco parentis* status to maintain a custody action?

(2) Whether the trial court erred in ruling that the record supports a finding by convincing evidence that Mother's *prima facie* right to custody should be forfeited in the child's best interests?

(a) Whether the trial court erred in basing its decision on mother's past history rather than on her present capabilities to care for the child?

(b) Whether the trial court committed error in according the child's preference sufficient weight to overcome Mother's *prima facie* right to custody when the record as a whole does not support such a finding?

(c) Whether the trial court erred in its failure to consider the well established policy within the law to keep siblings living together whenever possible?

Before we address the merits of Mother's contentions, we must first note this court's standard of review of child custody orders:

The scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*Kaneski v. Kaneski*, 413 Pa.Super. 173, 604 A.2d 1075 (1992) (citing *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992)).

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. While there is no mention of family, a parent's right to child custody, or the protection of a child's welfare in this amendment or elsewhere in the Constitution, the United States Supreme Court has constitutionally protected each of these interests as a fundamental liberty under the Fourteenth Amendment.[2]

---

2. The United States Supreme Court first extended constitutional protection to the parent/child relationship in 1923 when it explained that although no exact definition of the liberty guaranteed by the Fourteenth Amendment existed, "[w]ithout doubt, it denotes . . . the right of the individual to . . . establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Approximately twenty years later, in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Court recognized that

Pennsylvania courts have similarly recognized that the law protects the natural parent's relationship with his or her child and will not interfere unnecessarily with that relationship, even at the expense of estrangement to the extended family. *See Jackson v. Garland,* 424 Pa.Super. 378, 622 A.2d 969, 971 (1993) (citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and *Weber v. Weber,* 362 Pa.Super. 262, 524 A.2d 498 (1987)). In fact, our General Assembly has specifically declared that:

> [I]t is the public policy of this Commonwealth, when in the best interest of the child, to assure reasonable and continuing contact of the child with both parents after separation or dissolution of the marriage and the sharing of the rights and responsibilities of child rearing by both parents....

23 Pa.C.S.A. § 5301.

In furtherance of this public policy, the legislature has specified limited circumstances in which governmental intrusion into the family is warranted. *See* 42 Pa.C.S.A. § 6351–52 (outlining procedures for initiating dependency proceedings); 23 Pa.C.S.A. § 2511 (involving the involuntary termination of parental rights); 23 Pa.C.S.A. § 6301 *et seq.* (taking an abused child into protective custody); 23 Pa.C.S.A. § 5311–13 (concerning grandparents' rights to visitation); 23 Pa.C.S.A. § 5301 *et seq.* (concerning custody and visitation rights between parents in a divorce action); *see also Jackson, supra,* 424 Pa.Super. 378, 622 A.2d 969.

Protecting family unity and the parent/child relationship, however, is becoming increasingly difficult. The traditional American family is facing problems that were virtually nonexistent one hundred years ago. Divorces are on the rise, and expecting parents increasingly choose not to get married.

society has an interest in protecting the welfare of all children: "[i]t is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens." *Id.* at 165, 64 S.Ct. at 442. Finally, in 1974, the Court held that, "[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974).

Unfortunately, children are frequently caught in the middle of their parents' difficulties—e.g., alcoholism, drug addiction, domestic violence, homelessness, separation, divorce, etc. As a result of these difficulties, many children reside with, and form strong emotional attachments and relationships with, persons other than their natural or biological parents. An obvious problem arises when one or both of the natural parents later seek to regain custody of the child from the parental surrogate. In many cases, however, the third party or non-parent has assumed the role of "psychological parent" to the child and, hence, is unwilling to transfer custody to the biological parent. In these situations, the judicial system inherits the confounding task of deciding which "parent" will receive custody.

In Pennsylvania, there are three types of custody disputes: parent versus parent; parent(s) versus state; and parent(s) versus third party. *In re Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977). Persons other than natural or biological parents are deemed to be "third parties" for purposes of custody disputes. *Gradwell v. Strausser,* 416 Pa.Super. 118, 121–23, 610 A.2d 999, 1001 (1992) (citing *Hernandez, supra,* 249 Pa.Super. 274, 376 A.2d 648 and *Commonwealth ex rel. Witherspoon v. Witherspoon,* 252 Pa.Super. 589, 384 A.2d 936 (1978)).

In determining the appropriate standard for adjudication of custody disputes between a parent or parents and a third party, the Pennsylvania Supreme Court, in *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980), adopted the carefully fashioned principles set forth by this court in *Hernandez, supra,* 249 Pa.Super. 274, 376 A.2d 648.

> Although the best interest of the child remains of paramount concern, the parent has 'a *prima facie* right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party ... the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Hernandez*, 249 Pa.Super. at 286, 376 A.2d at 654 (emphasis added). In adopting these principles, the Court in *Ellerbe* noted that this standard does not preclude an award of custody to the non-parent, but rather "simply instruct[s] the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." *Ellerbe*, 490 Pa. at 367–68, 416 A.2d at 514. Interestingly, the courts have differentiated between non-related third parties and related third parties, but have declined to draw a distinction in the burden of proof as to each. *Hernandez*, 249 Pa.Super. at 287, 376 A.2d at 654; *see also Commonwealth ex rel. Patricia L.F. v. Malbert J.F.*, 278 Pa.Super. 343, 420 A.2d 572 (1980).

In *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980), the Court once again recognized the importance of parenthood as a factor in determining the best interests of the child. Importantly, however, the Court noted that "other factors which have significant impact on the well-being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit." *Id.* at 328, 421 A.2d at 161. Expounding upon this, this court, in *Snarski v. Krincek*, 372 Pa.Super. 58, 538 A.2d 1348 (1988), enumerated several considerations which must be weighed against one's parental status in making custody determinations:

First, although parenthood is a highly important factor, it should not be accorded determinative weight in our decision. Other factors, like the value of stability, are also to be accorded great weight. Indeed, in *Ellerbe* itself[,] the Supreme Court affirmed the trial court's grant of custody to grandparents over a parent of the subject child for the very reason that the child had developed a stable relationship with the grandparents and had a stable environment with them. The same basic situation was presented in *Albright*, and once again the grandparents were given custody. Second, the *Hernandez* standard is first and foremost an allocation of the burden of proof to the third parties, but it does not impose on them the burden of showing that the

parent is unfit. Thus, the issue centers on the child, and not on the parent.

*Snarski,* 372 Pa.Super. at 77, 538 A.2d at 1358 (citations omitted); *see also Vicki N. v. Josephine N.,* 437 Pa.Super. 166, 649 A.2d 709 (1994).

▄▄▄ Again, parenthood alone is insufficient to defeat a custody claim raised by a non-parent. The most important issues in a custody dispute are the child's physical, intellectual, moral, and spiritual well-being. *Dorsey v. Freeman,* 438 Pa.Super. 236, 239, 652 A.2d 352, 353 (1994) (citing *Nonnenman v. Elshimy,* 419 Pa.Super. 597, 615 A.2d 799 (1992) and *Warren v. Rickabaugh,* 410 Pa.Super. 431, 600 A.2d 218 (1991)).

[T]he fact that the best interests of the child is the paramount consideration is ... beyond peradventure.... Indeed, even the rights of natural parents are subordinate to the child's best interest.

*Karner v. McMahon,* 433 Pa.Super. 290, 301, 640 A.2d 926, 932 (1994) (citing *Constant A. v. Paul C.A.,* 344 Pa.Super. 49, 496 A.2d 1 (1985)) (emphasis added).

▄▄▄ Absent a *prima facie* right to custody, however, a third party lacks standing to even seek custody as against the natural parents. *Rosado v. Diaz,* 425 Pa.Super. 155, 158–60, 624 A.2d 193, 195 (1993); *Gradwell,* 416 Pa.Super. at 123–25, 610 A.2d at 1002; *see also Helsel v. Blair County Children & Youth Services,* 359 Pa.Super. 487, 519 A.2d 456 (1986). This is the case because a biological parent's *prima facie* right to custody should not be subject to challenge without a clear and convincing showing that the child is not receiving proper parental care. *Gradwell,* 416 Pa.Super. at 123–25, 610 A.2d at 1002 (citing *Helsel,* 359 Pa.Super. at 496, 519 A.2d at 460).

▄▄▄ The appropriate manner for a third party to challenge child custody is through dependency proceedings. *See* 42 Pa.C.S.A. § 6301 *et seq.; Gradwell, supra,* 416 Pa.Super. 118, 610 A.2d 999; *Helsel, supra,* 359 Pa.Super. 487, 519 A.2d 456. In a dependency proceeding, the burden is on the party seeking to take the child from the parents to show by clear and convincing evidence that the child is dependent. 42

Pa.C.S.A. § 6341(c); *Helsel, supra,* 359 Pa.Super. 487, 519 A.2d 456. *See also Ellerbe, supra,* 490 Pa. 363, 416 A.2d 512; *Commonwealth ex rel. Kraus v. Kraus,* 185 Pa.Super. 167, 138 A.2d 225 (1958); *cf. In re Miller,* 380 Pa.Super. 423, 552 A.2d 261 (1988) (holding that, under Juvenile Act, child may be adjudicated dependent when it is established by clear and convincing evidence that the child is without proper parental care and such care is not immediately available). It is only after a child is found dependent that a court will engage in custody proceedings, where the standard is the best interests of the child. *Bishop v. Piller,* 399 Pa.Super. 52, 55–58, 581 A.2d 670, 672–73 (1990). Thus, unless the natural parents' *prima facie* right to custody is successfully overcome via the dependency proceedings, this court cannot confer standing upon third parties to interfere with the parent/child relationship. 42 Pa.C.S.A. § 6301 *et seq.; Gradwell, supra,* 416 Pa.Super. 118, 610 A.2d 999.

 The exception to this third-party-lack-of-standing-preclusion is proof that such a "party stands *in loco parentis,* that is, where he or she has 'assumed obligations incident to the parental relationship.'" *Gradwell,* 416 Pa.Super. at 123, 610 A.2d at 1002 (citing *Burke v. Pope,* 366 Pa.Super. 488, 531 A.2d 782 (1987); *Jones v. Stone,* 343 Pa.Super. 416, 495 A.2d 205 (1985); *Commonwealth ex rel. Gorto v. Gorto,* 298 Pa.Super. 509, 444 A.2d 1299 (1982) and *Commonwealth ex rel. Patricia L.F. v. Malbert J.F.,* 278 Pa.Super. 343, 420 A.2d 572 (1980)). The rights and obligations arising out of that relationship are exactly the same as between parent and child. *Gradwell,* 416 Pa.Super. at 125–27, 610 A.2d at 1003 (citing *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977)).

> The phrase *"in loco parentis"* refers to a person who puts himself in the situation of assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *"in loco parentis"* embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties.

*Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 565, 241 A.2d 531, 533 (1968). *See also Vicki N. v. Josephine N.,* 437 Pa.Super. 166, 649 A.2d 709 (1994) (maternal aunt); *Karner v. McMahon,* 433 Pa.Super. 290, 640 A.2d 926 (1994) (stepfa-

ther); *Rosado v. Diaz,* 425 Pa.Super. 155, 624 A.2d 193 (1993) (de facto stepmother); *Wilson v. Wilson,* 406 Pa.Super. 473, 594 A.2d 717 (1991) (foster parent); *Mitch v. Bucks County Children & Youth Social Service Agency,* 383 Pa.Super. 42, 556 A.2d 419 (1989) (prospective adoptive parents); *Burke v. Pope,* 366 Pa.Super. 488, 531 A.2d 782 (1987) (non-relative); *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977) (foster parents); *cf. Van Coutren v. Wells,* 430 Pa.Super. 212, 633 A.2d 1214 (1993) (paternal grandfather where he never had custody of child); *Gradwell v. Strausser,* 416 Pa.Super. 118, 610 A.2d 999 (1992) (paternal grandfather where child lived with grandfather *and* natural parents).

■ After carefully reviewing the facts in the case at bar, we find that Maternal Aunt clearly established that she stands *in loco parentis* to Daughter. At the time of the August, 1994 hearing, Daughter had been in the custody of Maternal Aunt for approximately twenty-eight months. During that time, Maternal Aunt and Uncle provided Daughter with food, shelter, clothing and ensured that she received an education. Because Maternal Aunt has assumed primary parental responsibility since 1992 to the present, we find that Maternal Aunt has standing to seek custody of Daughter. *Vicki N., supra,* 437 Pa.Super. 166, 649 A.2d 709; *Karner, supra,* 433 Pa.Super. 290, 640 A.2d 926.

We are unpersuaded by Mother's claim that this conclusion is in error. Citing *Gradwell, supra,* 416 Pa.Super. 118, 610 A.2d 999, Mother contends that a third party cannot place himself *in loco parentis* status in defiance of the parent's wishes and the parent/child relationship. However, there is no evidence in the record that Mother was defiant with respect to Daughter living with Maternal Aunt. On the contrary, Mother consensually left Daughter in the care of Maternal Aunt in the Spring of 1992. While Mother and Stepfather retained custody of Brother, Mother testified at both hearings that she felt compelled to leave Daughter with Maternal Aunt/Maternal Grandmother because she did not want to subject Daughter to homelessness. Whatever the reason, Daughter most certainly did not commence residing with Maternal Aunt in defiance of Mother's wishes.

■ Next, after examining the notes of testimony and evidence of record, we find that the trial court did not commit a gross abuse of discretion in awarding primary physical custody to Maternal Aunt, as convincing reasons support the finding that such an award is clearly in Daughter's best interests. *Kaneski, supra,* 413 Pa.Super. 173, 604 A.2d 1075; *Hernandez, supra,* 249 Pa.Super. 274, 376 A.2d 648.

The record reflects the following: Mother, during the September 17, 1993 hearing, admitted that while Daughter resided with her, they changed residences at least four to five times over a ten-year period. She also conceded that she and her husband (Stepfather) had separated on two or three occasions from 1985 to 1993 and that both she and her husband are recovering alcoholics and drug addicts. Mother also acknowledged the fact that neither she nor Stepfather have either a driver's license or automobile insurance. Nonetheless, Mother and/or Stepfather continue to drive their car to pick up Daughter on the weekends that they have partial custody.

Before Daughter went to reside with Maternal Aunt in 1992, Daughter missed twenty-six days of school in the 1991/1992 school year. Once in Maternal Aunt's care, Daughter missed only two days of school in the fourth quarter of the 1991/1992 school year, and her school attendance record for the 1992/1993 school year was also quite good. Although Daughter has always been a good student, her grades have definitely improved since she has resided with Maternal Aunt. Daughter testified *in camera* that while she rarely needs assistance with her homework, she is aware that Maternal Aunt and Uncle are always willing to render such assistance if she so desires.

The testimony also shows that Maternal Grandmother is usually home in the afternoons, awaiting Daughter's return from school. Maternal Aunt and Uncle return home from work at approximately 5:00 p.m. and 6:30 p.m., respectively. On most evenings, the Maternal Aunt, Uncle, Maternal Grandmother, and Daughter eat dinner together and enjoy routine family discussions.

In contrast, Mother works two jobs to make ends meet, including three to four weekends per month. Stepfather also works many weekends. On the weekends that both Mother and Stepfather work, Brother is placed in the care of Stepfather's seventy-one year old mother. In addition to their busy work schedules, Mother and Stepfather attend meetings several evenings per week to overcome their drug and alcohol addictions.

The testimony also reveals that all of Daughter's friends and family, except for her Mother, Stepfather, and half-brother, are in Philadelphia, where she now resides. Daughter testified at both hearings that she desires to stay in Philadelphia and attend high school with her friends.

With respect to her relationship with her Mother, Daughter told Judge Jackson that, "I don't really get along with my mother. . . . I haven't ever." Daughter also informed the trial judge that Mother works most of the time that she visits her and that when they are together, they argue a great deal.

While the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. *McMillen v. McMillen*, 529 Pa. 198, 202–04, 602 A.2d 845, 847 (1992) (citing *Commonwealth ex rel. Pierce v. Pierce*, 493 Pa. 292, 426 A.2d 555 (1981)). The child's preference, however, must be based on good reasons, and the child's maturity and intelligence must be considered. *Id.* (citing *Pierce, supra* and *Commonwealth ex rel. Holschuh v. Holland–Moritz*, 448 Pa. 437, 292 A.2d 380 (1972)). The weight to be given to a child's preference can best be determined by the judge before whom the child appears. *Id.; see also Altus–Baumhor v. Baumhor*, 407 Pa.Super. 276, 595 A.2d 1147 (1991).

During two separate *in camera* interviews, Judge Jackson had the opportunity to observe Daughter's demeanor and found Daughter to be "mature, intelligent and insightful." We find that Daughter's steadfast wish to live with her Maternal Aunt was properly considered, and we find no abuse

of discretion in the amount of weight afforded that preference. *McMillen, supra,* 529 Pa. 198, 602 A.2d 845.

 Next, Mother contends that the trial court erred in basing its custody order on Mother's past history, rather than on her present capabilities to care for the child. We must disagree. The trial judge did not base his decision solely on Mother's prior homelessness, drug addiction, or alcoholism, but, instead, looked to this prior conduct as but one factor in ascertaining the best interests of Daughter. Judge Jackson opined that, "These factors combined to give Jennifer (Daughter) an unstable, if not chaotic life." *See Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976) (holding that parent's non-marital relationships are at most factors to be considered in determining the best interests of the child); *Vicki N., supra,* 437 Pa.Super. 166, 649 A.2d 709 (considering Mother's alcohol abuse and medical problems in determining best interests of the child). While we applaud Mother's accomplishments to date,[3] we cannot find that the trial court erred in considering some of her past conduct in fashioning the custody order. The prevailing issue must remain the best interests of Daughter, and, in determining what those best interests are, the court must sometimes delve into the sometimes tarnished past of one or both of the parents or parties.

 Next, Mother contends that the trial court erred in not considering the policy against separation of siblings.[4] Although the general rule is that siblings should not be separated without compelling reasons, this policy is but one factor to be considered in determining the best interests of the child. *Mahoney v. Mahoney,* 354 Pa.Super. 585, 590–91, 512 A.2d 694, 697 (1986); *see also Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980); *Wiskoski v.*

3. Mother and Stepfather both participate in Alcoholics Anonymous meetings several times per week. Additionally, for purposes of this custody action, Mother and Stepfather submitted to drug testing. At the second hearing, counsel for Mother informed the court that the results of the drug tests were negative.

4. As noted above, Gregory, Daughter's half-brother, continues to live with Mother and Stepfather.

*Wiskoski,* 427 Pa.Super. 531, 629 A.2d 996 (1993); *Haag v. Haag,* 336 Pa.Super. 491, 485 A.2d 1189 (1984); *M.D. v. B.D.,* 336 Pa.Super. 298, 485 A.2d 813 (1984); *McAnallen v. McAnallen,* 300 Pa.Super. 406, 446 A.2d 918 (1982).

Since the policy against separation of siblings is not controlling, under this court's narrow scope of review, we can discern no abuse of discretion or manifest error presented by Mother which would warrant reversal on this ground. We note that the fact that the trial court failed to specifically discuss the existence of a general policy in favor of raising siblings together was not alone reversible error. *Mahoney,* 354 Pa.Super. at 590–91 n. 2, 512 A.2d at 697 n. 2. We will not remand merely to give the hearing judge an opportunity to discuss such a policy when to do so would only serve to further prolong this custody dispute. After examining the record, we must conclude that the trial court, upon hearing the testimony of numerous witnesses in this case, weighed that testimony carefully and found that Daughter's overall best interests would be served by the award of custody to Maternal Aunt, although this necessitated Daughter's separation from Gregory.

While Maternal Aunt was awarded primary physical custody of Daughter, Judge Jackson awarded liberal partial physical custody to Mother on alternating weekends. If Mother chooses to exercise her right to take Daughter every other weekend,[5] and there is no evidence of record to indicate that Maternal Aunt would do anything to hinder that right, she can be assured that her daughter and son's relationship will continue to grow. The same can be said for Mother and Stepfather's relationship with Daughter.

For these reasons, we cannot find that the trial court committed a gross abuse of discretion in awarding custody to Maternal Aunt. *Kaneski, supra,* 413 Pa.Super. 173, 604 A.2d 1075; *McMillen, supra,* 529 Pa. 198, 602 A.2d 845.

Order affirmed.

---

5. In addition to alternating weekends, Judge Jackson awarded partial custody to Mother for one-half of the Winter and Spring school vacations, and for six weeks during Daughter's Summer school vacation.